Benjamin H. Price (TX 24060441)
Exall & Wood PLLC
3838 Oak Lawn Ave., Suite 1750
Dallas, Texas 75219
Telephone: (469) 619-6321
Facsimile: (469) 619-6511
bprice@exallwood.com

COUNSEL FOR U.S. MERCHANTS FINANCIAL
GROUP, INC.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **In re:** | § § § | **Chapter 7** |
| **Louis E. Martin, Jr.,** | § § § | **Case No.:  15-41103** |
| **Debtor.** | § § § § | |
| | § § | |
| **U.S. Merchants Financial Group, Inc.,** | § § § | |
| **Plaintiff,** | § § | **Adversary No. _____** |
| v. | § § § | |
| **Louis E. Martin, Jr.,** | § § § | |
| **Defendant.** | § § | |

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND
OBJECTION TO DISCHARGE**

U.S. Merchants Financial Group, Inc. ("**Merchants**"), a creditor and party in interest herein, hereby files this files this *Complaint to Determine Dischargeability of Debt and Objection to Discharge* (the "**Complaint**").  In support of its Complaint, Merchants respectfully states as follows:

# I.
# JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 523 and 727. This is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

# II.
# PARTIES

2. Plaintiff Merchants is a California corporation with its principal office at 8737 Wilshire Blvd., Beverly Hills, CA 90211.

3. Defendant Louis E. Martin, Jr. (the "**Debtor**"), is the debtor in this Chapter 7 bankruptcy case (the "**Bankruptcy Case**"). Pursuant to Rule 7004(b) of the Federal Rules of Bankruptcy Procedure, the Debtor may be served with process by first-class mail at 2340 Briar Court, Frisco, Texas 75034.

# III.
# FACTS APPLICABLE TO ALL COUNTS

**A.    The Debtor Defrauds Merchants, Leading to the Synergy Judgment**

4. From at least August 2002 through March 2013, the Debtor and his business partner Chuck Clark formed, operated and were officers of 13 Florida companies. Each company operated from one of two common Florida addresses and shared common officers (sometimes the Debtor was the president and Clark was the vice president or secretary/treasurer; sometimes Clark was the president and the Debtor was the vice president). Ten of the companies were formed and administratively dissolved during the five-year time period from August 2002 to September 2007.

5. Two of the now defunct companies were Synergy Design Group, Inc. ("**Synergy**"), and AOS, Inc. ("**AOS**"), a holding company that owned either a 50.0% or 66.7% interest in

Synergy during 2003-2004.[1] In 2003, Synergy engaged in a one-time transaction by which it sold a large shipment of road flares to Sam's Club. Merchants provided a specific kind of packaging required by Sam's Club, and Sam's Club introduced Synergy to Merchants and instructed Synergy that it should use Merchants to provide packaging for the products that were the subject of the Sam's Club transaction.

6.     During the time period from September 17-22, 2003, the Debtor discussed the terms of the Sam's Club transaction with Doug Farrell of Merchants in an effort to get Merchants to provide the packaging services at issue on credit. In the course of those discussions, the Debtor made the following materially false representations to Merchants:

   i.   The Debtor specifically held himself out as the "C.E.O." of Synergy on multiple occasions (verbally and in writing), indicating that he had ultimate control over Synergy's finances.[2]

   ii.  The Debtor, in his capacity as the CEO of Synergy, represented to Merchants that he would personally oversee the Synergy/Merchants relationship.

   iii. The Debtor represented to Merchants that Synergy was a sizable company with significant assets on hand and it would therefore have no trouble making payments to Merchants on a prompt and timely basis.

   iv.  The Debtor gave Merchants his "personal assurance" that all Merchants' invoices would be paid.

   v.   The Debtor misrepresented Synergy's profit margin on the Sam's Club transaction in an effort to get better terms from Merchants.

7.     By early January 2004, Merchants had provided all of the agreed services and, from November 11, 2003 through January 5, 2004, Merchants issued 43 invoices to Synergy totaling

---

[1] Synergy and AOS both forfeited their corporate charters within a year of their formation, and applications to reinstate both entities were not filed until September 22, 2003 – the day that Synergy accepted Merchants proposal for packaging services in connection with the Sam's Club transaction that gave rise to Merchants' debt in this Bankruptcy Case.

[2] The Debtor later admitted at trial that he was not the CEO of Synergy and that it would be "false" if he had in fact represented himself to be the CEO of Synergy in soliciting business from Merchants. The Debtor has also claimed that, despite his many years' experience as an owner and executive officer of at least 13 companies, he did not know that the C.E.O. was the highest ranking officer elected by a board to operate a company.

COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND
OBJECTION TO DISCHARGE – Page 3

$278,452. Of this amount, Synergy only remitted $6,773, leaving a remaining balance of $271,679 which was never paid.

8. On February 17, 2004, the Debtor made the following representations in an e-mail sent to an employee of Merchants in response to Merchants' inquiry as to when the past due invoices would be paid (referred to herein as the "**2/17/04 Email**"):

> I apologize for the delay in payment. I certainly understand your desire to collect what is owed as I feel the same way about all of our accounts. I was expecting to receive full payment from Sam's Club by this time, but we have not yet received this. As S.D.G. [Synergy Design Group] is a smaller company, we are unfortunately unable to make payment on these invoices until we receive income from Sam's Club…Hopefully, we will be receiving final payment from Sam's in the next couple of weeks. As soon as we do, all monies owed to U.S. Merchants will be paid in full.

9. The foregoing email was sent for the sole purpose of holding off Merchants' collection efforts while the Debtor and Chuck Clark siphoned all of the cash out of Synergy. This is clearly evident from the entries in Synergy's general ledger during this time period, which show that:

  i. During the 34-day period immediately preceding the Debtor's sending of the above email, Synergy made significant cash deposits into its operating account totaling $864,051.95, including a $232,575.33 cash deposit noted as "sams payment" on January 15, 2004, and a $631,476.62 cash deposit from "Sales" on February 12, 2004.

  ii. Between January 20, 2004, and February 12, 2004, according to Synergy's general ledger and check register, Synergy issued dividend payments and payments on shareholder liabilities totaling $454,912.35. Of that amount, $244,912.35 consisted of payments to AOS, and $180,000.00 consisted of a February 12, 2004, dividend payment directly to the Debtor. The Debtor's personal checking account records also reflect a deposit in the amount of $207,000.00 on February 23, 2014.

  iii. Between February 17, 2004 (the date of the Debtor's fraudulent email to Merchants), and March 11, 2004, Synergy's made an additional cash deposit from sales into its operating account totaling $617,643.70 (on March 5) and issued an additional dividend check to the Debtor in the amount of $270,432.61.

    iv.    In total, from September 2003 through March 2004, Synergy made payments to its shareholders totaling at least $856,252, while leaving an unpaid balance to Merchants of $271,679. According to Synergy's financial records, the Debtor personally received at least $450,432 in distributions from Synergy over seven months from September 1, 2003, through March 31, 2004.

10.    On March 15, 2004, Merchants filed suit against Synergy in Los Angeles County, California Superior Court, alleging breach of contract and related claims arising from Synergy's failure to pay for the packaging services provided by Merchants. On August 16, 2004, the California court entered a default judgment in favor of Merchants and against Synergy for actual damages in the amount $271,679 plus $296.50 in costs (the "**Synergy Judgment**"). The Synergy Judgment remains wholly unsatisfied.

**B.**    <u>**The Debtor Purchases a Home for $583,000 in Cash during the Same Month he is Personally Sued by Merchants**</u>

11.    On June 2, 2010, Merchants filed a lawsuit against the Debtor in Los Angeles County, California Superior Court (the "**CA Alter Ego Lawsuit**"), seeking to have the Debtor held personally liable for the Synergy Judgment based on the fact that Synergy was, at all relevant times, the Debtor's alter ego.[3]

12.    Just three weeks later, on June 24, 2010, the Debtor purchased a 5,095 square foot home located at 4821 Normandy Drive in Frisco, Texas (the "**Normandy Property**"), for "$583,000 and some change." The Debtor paid the $583,000-plus purchase price in cash. *Id*. at After buying the Normandy Property, the Debtor immediately set about making substantial improvements to the property, including (i) the installation of travertine floors and new countertops and (ii) the installation of a new security gate. Prior to moving into the Normandy Property, the

---

[3] After the Los Angeles County Superior Court determined that it lacked personal jurisdiction over the Debtor, Merchants filed a substantially similar lawsuit in Dallas County District Court (the "**TX Alter Ego Lawsuit**").

Debtor rented a home located at 6417 Hampton Court in The Colony, TX, so no equity was rolled over from the Debtor's prior residence into the Normandy Property.

13. The Debtor has not been able to keep his story straight when attempting to explain the source of the $583,000-plus of cash used to purchase and improve the Normandy Property. During prior sworn testimony, the Debtor testified that he received the necessary cash in the form of a "loan" from TotalFlare, Inc. ("**TotalFlare**") – another entity in the web of companies formed and then dissolved by the Debtor and Chuck Clark since the Debtor's initial involvement with Merchants. The Debtor also testified that (i) he pledged his stock in TotalFlare in order to secure that "loan" and (ii) his TotalFlare stock was foreclosed upon when he was unable to make payments on that "loan." This false testimony was exposed for the first time during the Debtor's 341 meeting in this Bankruptcy Case, when the Debtor testified that he sold $61,317 of TotalFlare stock in 2013.[4] At this stage, it is unclear where the non-exempt cash came from that was used to purchase the Normandy Property.

C. **Dallas County Court's Entry of a Fraud Judgment Against the Debtor Based on Alter Ego**

14. On March 26 and March 27, 2013, the TX Alter Ego Lawsuit was tried in Dallas County District Court. On April 11, 2013, the Dallas County District Court entered a final judgment in Merchants' favor and against the Debtor, personally, in the amount of $271,679 (plus $296.50 in costs and pre-judgment interest at the rate of 10% per annum on the amount of the judgment) (the "**TX Alter Ego Judgment**"). In its Findings of Fact and Conclusions of Law (attached hereto as **Exhibit A**), the Dallas County District Court found that, *inter alia*, (i) "Martin engaged in conduct constituting 'actual fraud'…i.e. conduct that was dishonest in purpose and intended to deceive – by at the outset of the relationship, making false and misleading statements

---

[4] This sale of stock is listed in Declaration # 2 in the Debtor's Statement of Financial Affairs [Docket No. 1].

COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND
OBJECTION TO DISCHARGE – Page 6

to Merchants," and (ii) "Martin, acting in his capacity as an officer and stockholder of Synergy, misused Synergy's corporate fiction to defraud Merchants and evade a legitimate obligation for Martin's personal benefit."

15. The Texas Alter Ego Judgment was premised on the fact that the Debtor was Synergy's alter ego during at least the 2003-2004 time frame because, *inter alia*, (i) the debt underlying the Synergy Judgment was incurred while Synergy's corporate privileges were forfeited, and (ii) the Debtor misused Synergy's corporate fiction to defraud Merchants and incur and evade legitimate obligations. As recognized by the Dallas County District Court in its Findings of Fact and Conclusions of Law:

> Because Martin caused Synergy to be used for the purpose of perpetrating and did perpetrate an actual fraud on Merchants primarily for the direct personal benefit of Martin who, in 2004, personally received hundreds of thousands of dollars in cash distributions from Synergy that otherwise would have been available to pay Merchants debt, Merchants is entitled to pierce the corporate veil and hold Martin personally liable as a shareholder of Synergy for the principal amount of Merchants' unsatisfied judgment against Synergy plus accrued and unpaid post-judgment interest.

**D.     Post-Judgment Collection Efforts and Denial of Debtor's Appeal**

16. The Debtor initiated an appeal of the Texas Alter Ego Judgment through the filing of a Notice of Appeal on July 8, 2013. On October 4, 2013, the Debtor filed an affidavit stating that he had a negative net worth (the "**Negative Net Worth Affidavit**") in order to appeal the Texas Alter Ego Judgment without posting a bond.

17. On December 20, 2013, Merchants took the Debtor's post-judgment deposition regarding his assets, liabilities, and purported negative net worth (the "**Post-Judgment Deposition**"). During the Post-Judgment Deposition, the Debtor testified that:

    i.    In the three years preceding the Post-Judgment Deposition, the Debtor had owned 16 vehicles, including seven Mercedes, three Range Rovers, two Jaguars, and an

COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND
OBJECTION TO DISCHARGE – Page 7

    Aston Martin.  Five of these 16 vehicles (Jaguar, Range Rover, Mercedes Roadster, Lincoln MKX, and Cadillac) were purchased in the five months after the entry of the TX Alter Ego Judgment on April 12, 2013.  Yet the Debtor is unable to recall pertinent details about the purchase and sale of many of these vehicles (e.g., purchase or sales price, form of payment made or received, the seller or buyer on the other side of the transaction).

  ii. The Debtor has transferred large amounts of personal funds to an entity he controls called SafeFlare Development, Inc. ("**SafeFlare**").  He has also purchased cars for his personal use using the SafeFlare bank account and paid back personal loans using the SafeFlare bank account.

  iii. The Debtor was listed as a co-grantor on a deed conveying a condominium in Linwood, New Jersey in June 2013 (the "**NJ Condominium**").  The deed indicates that the sale price for the NJ Condominium was $110,000.  But the Debtor testified that he did not receive any of the $110,000 paid as the purchase price and that his business partner Chuck Clark "forged" his name on the conveyance documents.

  iv. In the three years preceding the Post-Judgment Deposition, the Debtor testified neither he nor his wife have held jobs, or otherwise earned salaries or wages, or collected any investment income.  Yet, approximately $90,000 was deposited into the Debtor's wife's checking account in the seven months following the TX Alter Ego Judgment in April 2013.  The Debtor testified that the majority of these deposits were given by him to his wife, but he is not able to testify as to where he got the funds for any specific deposit.

  v. The Debtor testified that he and his wife only have two bank accounts.  Yet, the Debtor was unable to identify within the statements for those two accounts any entries relating to a number of financial transactions he testified to have occurred in 2013 (e.g., entries relating to sales and purchases of numerous cars, a $27,000 loan from his father and the repayment thereof, a $10,000 loan from a friend and the repayment thereof, a $25,000 interest payment to JSCA (defined below), and $4,000 received for the sale of jewelry).

18. The Court of Appeals for the Fifth District of Texas denied the Debtor's appeal and affirmed the Texas Alter Ego Judgment on December 8, 2014.

**E.** **The Debtor's Bankruptcy Filing**

19. The Debtor filed this Bankruptcy Case and his bankruptcy schedules [Docket No. 1] (the "**Schedules**") on June 18, 2015 (the "**Petition Date**").

20. In his Schedules, the Debtor lists a Chuck Clark-owned company called "J.S.C.A., Inc." ("**JSCA**"), as the holder of a $343,171 claim that is allegedly secured by liens on the Debtor's

current residence located at 2340 Briar Court in Frisco, TX (the "**Briar Court Property**"). The Debtor claims he has received five separate loans from JSCA since 2011:

    i.    A $300,000 loan from JSCA in December 2011, which was secured by a lien on the Normandy Property. The Debtor testified in his Post-Judgment Deposition that $28,500 of the loan proceeds were used to pay off a year's worth of interest at the time the loan was originated in December 2011. The Debtor cannot recall what happened to the remaining $271,500, testifying only that some of the money went into SafeFlare and some of the money was used to pay living expenses. This loan was paid off when the Debtor sold the Normandy Property in March 2014.

    ii.    A $100,000 loan from JSCA in April 2012, which was allegedly secured by an additional lien on the Normandy Property that was never recorded. The Debtor cannot recall what bank account this $100,000 was deposited into or how the money was spent. This loan was paid off when the Debtor sold the Normandy Property in March 2014.

    iii.    A $50,000 loan from JSCA in August 2012, which was allegedly secured by an additional lien on the Normandy Property that was never recorded. The Debtor cannot recall what bank account this $100,000 was deposited into or how the money was spent. This $50,000 loan was paid off when the Debtor sold the Normandy Property in March 2014.

    iv.    A $253,028 loan from JSCA in March 2014, which was secured by a lien on the Briar Court Property and used to purchase that home.

    v.    A loan in the approximate amount of $90,143 (made sometime after March 2014 and before the Petition Date) that is allegedly secured by an additional unrecorded lien on the Briar Court Property.[5] The Debtor has provided no information regarding what happened to these loan proceeds or his reasons for borrowing the money.

21. In his Schedules, the Debtor also indicates that he sold or otherwise disposed of eight cars in the two-year period preceding the Petition Date. The Debtor cannot recall the trade-in value or other consideration he received in exchange for four of these cars. And in his Post-Judgment Deposition, the Debtor testified to having sold or otherwise disposed of several other

---

[5] The Schedules [Docket No. 1] provide almost no information on this loan, only disclosing that "Denton deed records show a Deed of Trust to secure a note in the original amount of $253,028. However there is a second lien to the same creditor to make up the amount shown."

COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND
OBJECTION TO DISCHARGE – Page 9

cars in the 2010-2013 time period, but the Debtor cannot recall what he received in exchange for these cars and/or where he deposited the proceeds received from the sales/trade-ins.

## IV.
## CAUSES OF ACTION

### COUNT I: 11 U.S.C. 523(a)(2)(A)

22. Merchants incorporates all preceding paragraphs as if fully set forth herein.

23. Section 523(a)(2)(A) of the Bankruptcy Code provides that a debtor is not discharged from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by…false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

24. As recognized in the Findings of Fact and Conclusions of Law supporting the Texas Alter Ego The Debtor, individually and/or through his alter ego Synergy, obtained services and an extension of credit from Merchants through false pretenses, false representations and/or actual fraud. The Debtor, individually and/or through his alter ego Synergy, (i) held himself out as the "C.E.O." of Synergy on multiple occasions (verbally and in writing and with knowledge that he was not the CEO of Synergy), indicating that he had ultimate control over Synergy's finances, (ii) represented to Merchants that he would personally oversee the Synergy/Merchants relationship, (iii) represented to Merchants that Synergy was a sizable company with significant assets on hand and it would therefore have no trouble making payments to Merchants on a prompt and timely basis, (iv) gave Merchants his "personal assurance" that all Merchants' invoices would be paid, and (v) misrepresented Synergy's profit margin on the Sam's Club transaction in an effort to get better terms from Merchants. The Debtor, individually and/or through his alter ego Synergy, knew the foregoing representations and/or pretenses were false. The Debtor, individually and/or through

his alter ego Synergy, intended to deceive Merchants in making the foregoing representations and/or setting forth the foregoing pretenses. Merchants actually and justifiably relied on the foregoing representations and/or pretenses. Merchants sustained a loss as a proximate result of its reliance on the foregoing representations and/or pretenses. Therefore, Merchants is entitled to a determination that the debt it is owed by the Debtor is not dischargeable pursuant to the provisions of 11 U.S.C. § 523(a)(2)(A).

25. Moreover, the Debtor, individually and/or through his alter ego Synergy, obtained services and an extension and/or renewal of credit from Merchants through false pretenses, false representations and/or actual fraud when the Debtor sent the 2/17/04 Email to persuade Merchants to hold off on pursuing a collection action while the Debtor siphoned cash out of Synergy. *See, e.g., Third Coast Bank, SSB v. Cohen (In re Cohen)*, No. 12-10027, 2013 WL 4079369 at *7 (Bankr. E.D. Tex. Aug. 13, 2013) (citations omitted) ("It is true that a fraudulently-induced forbearance may constitute an extension or renewal of credit for the purposes of § 523(a)(2)."). The Debtor, individually and/or through his alter ego Synergy, represented to Merchants that (i) payment from Sam's for the Sam's Club transaction had not yet been received, (ii) Synergy was too small of a Company and did not have sufficient assets to pay Merchants until it received payment from Sam's Club, and (iii) all monies owed to Merchants would be paid in full once Synergy received payment from Sam's Club. The Debtor, individually and/or through his alter ego Synergy, knew the foregoing representations were false. The Debtor, individually and/or through his alter ego Synergy, intended to deceive Merchants in making the foregoing representations. Merchants actually and justifiably relied on the foregoing representations. Merchants sustained a loss as a proximate result of its reliance on the foregoing representations. Therefore, Merchants is entitled to a determination that that the debt it is owed by the Debtor is

not dischargeable pursuant to the provisions of 11 U.S.C. § 523(a)(2)(A).

### COUNT II: 11 U.S.C. 523(a)(2)(B)

26. Merchants incorporates all preceding paragraphs as if fully set forth herein.

27. Section 523(a)(2)(B) of the Bankruptcy Code provides that a debtor is not discharged from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by…use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive." 11 U.S.C. § 523(a)(2)(B).

28. In the event that the Court determines that the 2/17/04 Email is a "statement in writing…respecting the debtor's or an insider's financial condition," Merchants is entitled to a determination that its claim not dischargeable pursuant to the provisions of Section 523(a)(2)(B). *See, e.g., Bandi v. Becnel (In re Bandi)*, 683 F.3d 671, 677 (5th Cir. 2012) (discussing the meaning of "statement respecting the debtor's or an insider's financial condition" for purposes of Section 523(a)(2)(B)). The Debtor, individually and/or through his alter ego Synergy, sent a materially false statement in writing when he sent the 2/17/04 Email. The Debtor, individually and/or through his alter ego Synergy, caused the 2/17/04 Email to be made or published with the intent to deceive Merchants. Merchants actually and reasonably relied on the representations set forth in the 2/17/04 Email. Accordingly, in the event that the Court determines that the 2/17/04 Email is a "statement in writing…respecting the debtor's or an insider's financial condition," Merchants is entitled to a determination that the debt it is owed by the Debtor not dischargeable pursuant to the provisions of Section 523(a)(2)(B).

### COUNT III: 11 U.S.C. 523(a)(6)

29. Merchants incorporates all preceding paragraphs as if fully set forth herein.

30. Section 523(a)(6) of the Bankruptcy Code provides that a debtor is not discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

31. Under applicable 5th Circuit law, "[t]he test for willful and malicious injury…is condensed into a single inquiry of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor." *See Williams v. Intl Brotherhood of Elec. Workers Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003) (citations omitted). As recognized by this Court, "[t]he Fifth Circuit has acknowledged that a breach of contract may involve an intentional or substantially certain injury." *Cybuski v. Utley (In re Utley)*, 2010 WL 3342242 at *4 (Bankr. E.D. Tex. 2010) (citations omitted). And a "knowing breach of a clear contractual obligation that is certain to cause injury may prevent discharge under Section 523(a)(6), regardless of the existence of separate tortious conduct." *In re Williams* at 510.

32. The Debtor, individually and/or through his alter ego Synergy, willfully and maliciously injured Merchants and/or the property of Merchants by, *inter alia*, (i) lying to Merchants about the status of payments received from Sam's Club in connection with the Sam's Club transaction and (ii) siphoning all of the cash out of Synergy during the same 2003-2004 time period, leaving no cash in the entity to pay the obligations owed to Merchants. Such conduct constituted a breach of a clear contractual obligation that was owed to Merchants, and such conduct was certain to cause injury to Merchants at the time it was undertaken because it was intended to siphon all remaining cash out of Synergy. Therefore, Merchants is entitled to a determination that the debt it is owed by the Debtor is not dischargeable pursuant to the provisions of 11 U.S.C. § 523(a)(6).

## COUNT IV:  11 U.S.C. 727(a)(3)

33.     Merchants incorporates all preceding paragraphs as if fully set forth herein.

34.     Section 727(a)(3) of the Bankruptcy Code provides that a debtor is not entitled to a discharge if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case."  11 U.S.C. § 727(a)(3).

35.     As described above, the Debtor has failed to keep or preserve recorded information, including books, documents, records and papers, from which debtor's financial condition or business transactions might be ascertained.  To cite only a few examples, (i) the Debtor does not have sufficient records to show where the nearly $800,000 he has "borrowed" from JSCA has been deposited and/or what the funds were then used for, (ii) the Debtor does not have adequate records setting forth even the most basic details (purchase price, sale price, buyer, disposition of proceeds, etc.) regarding at least 10 luxury automobiles he has bought and sold in the last several years, and (iii) the Debtor has not maintained adequate documentation to support his contention that the Normandy Property was purchased with a "loan" from Totalflare and that his stock was later foreclosed upon.

36.     The Debtor's complete failure to maintain basic records related to his financial condition and/or business transactions is not justified by the circumstances.  The Court should therefore deny the Debtor a discharge pursuant to 11 U.S.C. § 727(a)(3).

## COUNT V:  11 U.S.C. 727(a)(5)

37.     Merchants incorporates all preceding paragraphs as if fully set forth herein.

38.     Section 727(a)(5) provides that a debtor is not entitled to a discharge if "the debtor has failed to explain satisfactorily, before determination or denial of a discharge under this

paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5).

39. The Debtor has failed to explain satisfactorily a loss of assets or deficiency of assets to meet his liabilities. The Debtor obtained significant funds from, *inter alia*, his siphoning of money out of Synergy and his alleged "loans" from JSCA. Nevertheless, the Debtor now claims he has virtually no assets (without sufficient explanation) and has not provided any competent evidence or documents regarding what happened to cash and other assets that he has held at different points over the last several years. The Court should therefore deny the Debtor a discharge pursuant to 11 U.S.C. § 727(a)(5).

### COUNT VI: FRBP 7008(b)

40. Merchants incorporates all preceding paragraphs as if fully set forth herein.

41. Rule 7008(b) of the Federal Rules of Bankruptcy Procedure allows the Court to enter a judgment against the Debtor for Merchants' attorneys' fees and expenses incurred in this proceeding. Merchants asks this Court to award its attorneys' fees and expenses as allowed by applicable law.

### V.
### PRAYER

**WHEREFORE**, Merchants respectfully requests for this Court to (i) award Merchants the relief requested herein; (ii) deny the Debtor a discharge of the debt owed to Merchants pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), and 523(a)(6); (iii) deny the Debtor a discharge of all of his debts pursuant to 11 U.S.C. §§ 727(a)(3) and 727(a)(5); (iv) direct the Debtor to reimburse Merchants for their attorneys' fees and expenses incurred in this proceeding; and (v) award Merchants such other and further relief that this Court deems just and proper.

Dated: September 15, 2015

          Respectfully submitted,

          **EXALL & WOOD PLLC**

          */s/ Benjamin H. Price*

          Benjamin H. Price (TX 24060441)
          Exall & Wood PLLC
          3838 Oak Lawn Ave., Suite 1750
          Dallas, Texas 75219
          Telephone: (469) 619-6321
          Facsimile: (469) 619-6511
          bprice@exallwood.com

          **COUNSEL FOR U.S. MERCHANTS FINANCIAL GROUP, INC.**